3:19mj1341 (SALM)

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

STATE OF CONNECTICUT      :
                          :
                          :     ss: City of New Haven
COUNTY OF NEW HAVEN       :

SEP 3 2019 AM 9:21
FILED-USDC-CT-NEW_HAVEN

**AFFIDAVIT**

I, Frank M. Castiglione III, being first duly sworn, hereby depose and state as follows:

1. I am a Special Agent with the Drug Enforcement Administration (DEA), United States Department of Justice. I am currently assigned to the DEA New Haven District Office (NHDO). I have been a Special Agent with the DEA since January 2018. I received approximately 19 weeks of training at the DEA Basic Agent Training Academy in Quantico, Virginia. Prior to being a DEA Special Agent, I was a Police Officer in North Haven, Connecticut, for approximately nine years. While employed as a Police Officer, I was assigned to the DEA NHDO as a Task Force Officer for over two years. During this time, I conducted and participated in numerous drug investigations. I also received training and instruction relative to drug investigations while attending the DEA Basic Narcotics School in Manchester, New Hampshire, and the Connecticut Police Academy.

2. I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I am also authorized to seek search warrants under Rule 41 of the Federal Rules of Criminal Procedure and 18 U.S.C. Sections 2703(c) and 2703(d).

3. The facts in this affidavit come from my own personal knowledge from having participated in this investigation and my training and experience, and also from information obtained by me from other law enforcement personnel. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. It sets forth only those facts necessary to support the requested authorization.

4. I submit this affidavit in support of a request for a search warrant to search the following cellular telephone, which is currently in the possession of law enforcement, and to extract electronically stored information: a black LG smartphone, model #LG-Q710AL, assigned phone number 475-202-1105, MEID #089458280008991811 (hereafter "**Target Device**"), which was seized from KEVIN LUCAS on or about August 22, 2019, and is currently in DEA custody.

5. I have written and executed search warrants which have resulted in the seizure of illegal drugs and evidence of drug violations. Also, I have executed seizure warrants that have resulted in the seizure of assets acquired with drug proceeds and assets utilized to facilitate drug dealing activities. During my law enforcement career, I have participated in numerous investigations involving those suspected of distributing illegal drugs, coordinated controlled purchases of illegal drugs utilizing confidential sources and undercover law enforcement officers, and written, obtain and coordinated the execution of search and arrest warrants pertaining to those involved in the distribution of illegal drugs. I have testified before grand juries and spoken with informants as well as other local, state and federal law enforcement officers regarding the manner in which drug distributors obtain, finance, store, manufacture, transport and distribute their illegal drugs. I have prepared numerous

affidavits in support of applications for search and arrest warrants that have resulted in Courts issuing orders that have led to the conviction of numerous defendants for violations of narcotics laws. Based upon my experience and training, I am familiar with the manner and means employed by narcotics traffickers, including the manner and means by which narcotics traffickers communicate, as well as the devices commonly utilized by the, and those methods employed by narcotics traffickers in an effort to avoid detection by law enforcement.

6. I know from my training and experience that drug traffickers use cellular telephones to contact their sources of supply, customers and co-conspirators. Often, these cell phones contain call lists, contact lists, and text messages and messages exchanged with drug trafficking associates through various social media applications.

## INVESTIGATION BACKGROUND

7. As part of my official duties, I am participating in an investigation of KEVIN LUCAS, who is also known as "DUTCH", concerning his distribution of heroin in the southern Connecticut area in violation of 21 U.S.C. 841(a)(1) (possession with intent to distribute and distribution of a controlled substance) ("Subject Offense"). Heroin is a Schedule I controlled substance under the federal Controlled Substances Act.

8. The facts in this affidavit are based on evidenced I gathered during the investigation, relayed to me by other law enforcement officers, and obtained from a confidential source who I have found to be reliable based on information provided. I have analyzed reports submitted by other DEA agents, received location data from LUCAS's cellular telephone which was obtained pursuant to a court-issued search warrant, analyzed telephone toll records, reviewed video surveillance of drug transactions between LUCAS and the

confidential source, and other information I have determined to be accurate and reliable. I have not set forth all the facts and evidence that I have gathered during the course of this investigation. Instead, I have set forth those facts that I believe are necessary to establish the existence of probable cause to support the requested warrant.

## THE RELEVANT FACTS

9. Acting on information gained over the course of the investigation, I and other law enforcement officers formulated plans to make controlled purchases of heroin from LUCAS using a DEA Confidential Source ("CS"). The CS has been a DEA CS since approximately September 2018. This CS is cooperating with the DEA in exchange for monetary compensation. Information provided by the CS to controlling agents during this investigation, as well as a separate DEA investigation, has been corroborated through multiple surveillance operations, successful arrest operations and independent investigation. Accordingly, the CS is believed to be truthful, accurate and reliable. The CS told me that he/she met LUCAS a number of years ago. The CS reported that he/she recently saw LUCAS while at a restaurant and that LUCAS expressed an interest in meeting with the CS to establish a drug distribution relationship. The CS further reported that LUCAS was using telephone number 475-202-1105, **the Target Device**.

10. According to a criminal check of LUCAS, he is a convicted felon with multiple arrests for the distribution and possession of narcotics in violation of state law in Connecticut and New York.

**The Acquisition of a Sample of Heroin on May 14, 2019, from LUCAS**

11. Subsequently, on May 14, 2019, CS arranged a meeting with LUCAS through consensually recorded calls and text messages to the Target Device. During the meeting, LUCAS

provided the CS with a bundle of heroin as a sample, which field tested positive for heroin. DEA lab analysis confirmed the presence of heroin. The meeting was recorded through a covert video/audio recording device worn by CS. LUCAS claimed that he distributed approximately 4,000 to 5,000 bundles of pre-packaged heroin[1] each week and that he never has a "drought" due to a consistent source of supply. LUCAS bragged about the potency of his heroin and showed the CS his cellular telephone which contained text messages of people requesting heroin.

12. Subsequently, CS conducted additional controlled purchases of large bundle quantities of heroin from LUCAS on May 22, 2019 (52 bundles), June 4, 2019 (150 bundles) and June 27, 2019 (100 bundles). On each occasion, the heroin acquired field tested positive for the presence of heroin. In each instance, CS arranged the transaction by engaging in consensually recorded calls and texts to the **Target Device**. During the course of the controlled purchases and surveillance conducted, agents identified LUCAS' residence at 79 Louisianna Avenue, Bridgeport, CT as his stash location and base of operations for his heroin distribution activity.

**Controlled Purchase of July 16, 2019**

13. On July 16, 2019, plans were made for the CS to make a controlled purchase of 100 bundles of heroin from LUCAS. At approximately 1:20 P.M., agents established surveillance of the Target Premises and observed LUCAS exit the address and depart the area in the Target Car. Surveillance units did not follow him. At approximately 1:52 P.M., the CS called LUCAS on the **Target Device** and said that he/she was ten minutes away from their regular

---

[1] From my training and experience, I know that pre-packaged heroin distributors in the southern Connecticut area commonly refer to ten bag increments of heroin held together by an elastic band as "bundles", "buns", or "bunnies." Bundles is a unit of sale that is unique to heroin distribution.

meeting spot. LUCAS indicated that he was on his way to pick up the requested heroin. At approximately 2:03 P.M., agents observed LUCAS return to Louisiana Avenue in the Target Car, park, and enter the Target Premises through the front door. At approximately 2:06 P.M., agents observed LUCAS exit the front door of the Target Premises, get into the Target Car and depart the area. Surveillance units followed LUCAS to the meet location where he parked the Target Car, exited and walked to the CS's vehicle. LUCAS got into the CS's vehicle and they drove across the parking lot to where the Target Car was parked. LUCAS got out of the CS's vehicle, briefly went into the Target Car, and then got back into the CS's vehicle at which time he gave the CS approximately 100 bundles of suspected heroin in exchange for $3,000.00 in DEA funds. LUCAS subsequently returned to the Target Car and departed the area. Surveillance was ended after LUCAS stopped at a nearby corner store.

14. Controlling agents searched the CS and his/her vehicle for contraband with negative results directly before and after the meeting with LUCAS. CS was also followed to the meeting location by surveillance team members and did not make any stops on the way. Agents also followed CS after the meeting to a pre-arranged briefing location and CS did not make any stops on the way. At the debriefing location, CS turned over the suspected heroin to case agents. The phone calls and/or text messages between LUCAS (who was using the **Target Device**) and the CS to arrange the transaction were recorded, and the meeting itself was recorded via a covert video/audio recording device worn by the CS. A field test of the 100 bundles was completed, resulting in a positive result for the presence of heroin. The suspected heroin has been submitted to the DEA laboratory for analysis and results are pending.

**Controlled Purchase of Heroin from LUCAS on August 7, 2019**

15. On August 7, 2019, plans were made for the CS to make a controlled purchase of 100 bundles of heroin from LUCAS. During a series of phone calls between LUCAS (who was using the **Target Device**) and the CS, it was learned that LUCAS only had 25 bundles readily available and offered to provide the CS with the remainder of the heroin, as well as 5 to 7 free bundles, on a later date. The CS agreed to buy the 25 bundles on this date. At approximately 12:54 P.M., agents established surveillance at the Target Premises and observed the Target Car parked on Louisiana Avenue. At approximately 1:02 P.M., agents observed LUCAS exit the front door of the Target Premises, walk to the street and put an unknown object in the passenger compartment of the Target Car. LUCAS then walked back toward the Target Premises.

16. At approximately 1:26 P.M., the CS called LUCAS on the **Target Device** and advised that he/she was ten minutes away from their regular meeting spot in Bridgeport. At approximately 1:33 P.M., agents observed LUCAS exit the front door of the Target Premises and enter the Target Car. At approximately 1:35 P.M., LUCAS departed the area in the Target Car and was followed by surveillance units to the meeting location where he parked adjacent to the CS's vehicle. The CS exited his/her vehicle and got into the front passenger seat of the Target Car. LUCAS then gave the CS approximately 25 bundles of suspected heroin to the CS in exchange for $700.00 in DEA funds. LUCAS then exited the CS's vehicle, got back into the Target Car and left the parking lot. Surveillance units lost sight of LUCAS for approximately five minutes, but then observed him operating the Target Car in close proximity to where the transaction with the CS had occurred. Agents followed LUCAS to Louisiana Avenue where he parked at approximately 2:03 P.M.

LUCAS then exited the Target Car and entered the Target Premises through the front door. Surveillance was then terminated.

17. Controlling agents searched the CS and his/her vehicle for contraband with negative results directly before and after the meeting with LUCAS. CS was also followed to the meeting and did not make any stops on the way. After the meeting with LUCAS, CS was followed to a pre-arranged debriefing location and did not make any stops on the way. At the debriefing, CS gave the suspected heroin to case agents. The phone calls and/or text messages between LUCAS (who was using the **Target Device**) and the CS to arrange the transaction were recorded. Controlling agents had equipped the CS with a covert video/audio recording device prior to the meeting with LUCAS, but it was later determined that the device failed to record due to an unknown technical issue. A field test of the 25 bundles was completed, resulting in a positive result for the presence of heroin. The suspected heroin has been submitted to the DEA laboratory for analysis and results are pending.

**Execution of Search Warrant at LUCAS' Residence**

18. On August 21, 2019, United States Magistrate Judge Sarah A.L. Merriam authorized search warrants for LUCAS' residence at 79 Louisianna Avenue in Bridgeport and for a Nissan Rogue SUV used by LUCAS. Magistrate Judge Merriam also issued a criminal complaint and arrest warrant for LUCAS charging a violation of 21 U.S.C. Section 841(a)(1)(possession with intent to distribute and distribution of heroin). At approximately 11:06a.m. on August 22, 2019, law enforcement personnel took LUCAS into custody in parking lot of a convenience store in the vicinity of his residence and simultaneously executed the search warrant at the residence. Following his arrest, I informed LUCAS of

his Miranda rights which he indicated he understood. LUCAS then stated that a cell phone seized from his incident to his arrest was assigned 475-202-1105, **the Target Device**. I took custody of the Target Device and later transported it to the DEA New Haven Office where it was processed as evidence. DEA continues to maintain custody of the Target Device at this time.

19. During the search of the basement of LUCAS' residence, case agents found, among other things, multiple white glassine baggies each containing a powdery substance held together with black elastic bands (which field-tested positive for heroin), a white rock-like substance contained within a paper towel and clear plastic wrapping that field (which field-tested positive for cocaine base, a white rock-like substance contained within clear plastic wrapping with pieces of grey and black tape (which field tested positive for cocaine), a blender containing powdery residue, a digital scale, suspected cutting agents, a strainer, a scooping instrument, stamps, rubber bands, a plastic bag containing empty wax folds that are commonly used to package heroin, a loaded Jimenez Arms 9mm semi-automatic handgun, loaded 9mm handgun magazines, a box of 9mm ammunition and $35,220.00 in cash.

20. I and other law enforcement officers that I have work with in drug investigations have had the opportunity to obtain search warrants for cell phones in the past. The execution of these search warrants has resulted in the recovery of, among things, text messages, photographs, WhatsApp messages and phone contacts that have constituted evidence of drug trafficking and often lead to information from which co-conspirators, including sources of supply can be identified. In this particular case, it is apparent that LUCAS utilizes the Target Device to conduct his drug trafficking operation. All of the controlled purchases of heroin by the

CS were arranged through contact with LUCAS on the Target Device and LUCAS has the Target Device on his person on the day of his arrest. He did not have any other cell phones on his person at the time of arrest. Further, case agents did not find any other cell phones in his residence. Accordingly, given the large bundle quantities of heroin to which LUCAS had access, I believe that the Target Device will contain evidence of communications with his source(s) of supply and other larger scale re-distributors of heroin whom LUCAS supplies.

21. Based upon the foregoing, there is probable cause to believe, and I do believe, that LUCAS has committed violations of 21 U.S.C. Sections 841(a)(1) and 846, to wit, distribution of, and possession with the intent to distribute, controlled substances, to wit, heroin; and, conspiracy to do the same, and that there is probable cause to believe that electronically stored information described herein and in the attachment hereto is recorded on the **Target Device** and constitutes evidence, fruits and/or instrumentalities of these offenses.

22. Based on my training and experience, and consultation with, and information from other law enforcement sources, including sources with expertise pertaining to the features and functionality of cellular telephones (including smartphones), I know the following information tends to exist on wireless telephones, including wireless telephones utilized by those engaged in narcotics trafficking activities:

   A. the telephone call number and other identifiers (ESN number, IMSI, IMEI, MEID, and SIM card number) associated with said device/s;

   B. call logs/histories, numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images and videos stored in the memory of said device/s;

  C. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described offenses;

  D. records which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

  E. information showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

  F. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

  G. saved searches, locations, and route history in the memory of said device/s; and,

  H. internet browsing history, to include, internet searches in the memory of said device/s.

**TECHNICAL TERMS**

23. Based on my training and experience, and consultation with, and information from, other law enforcement sources, including sources with expertise pertaining to the features and functionality of cellular telephones and computers, I use the following technical terms to convey the following meanings:

- Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling

communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

- IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

- Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

24. Based on my knowledge, training, and experience, and consultation with, and information from, other law enforcement sources, including sources with expertise pertaining to the features and functionality of cellular telephones and computers, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

25. Forensic evidence. As further described in Attachment A, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Target Devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Target Devices because:

26. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

27. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

28. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

29. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

30. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

31. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant. Based on the above stated factual details of the investigation, there is probable cause to believe, and I do believe, that the Target Devices contain stored electronic information, including telephone numbers, digits, names, text messages, photographs, videos, identifying information such as telephone numbers and serial numbers, the originating telephone numbers, and other electronic information as outlined in Attachment B, that will assist law enforcement in this investigation and which is evidence of the violations of the above.

32. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrants at any time in the day or night.

FRANK M. CASTIGLIONE III
DEA SPECIAL AGENT

Subscribed and sworn to before me
this 30th day of August, 2019,
at New Haven, Connecticut

/s/ Sarah A. L. Merriam, USMJ

HON. SARAH A.L. MERRIAM
UNITED STATES MAGISTRATE JUDGE